**THE FLORINDA, and three other cases.** *

Circuit Court of Appeals, Second Circuit.
March 4, 1929.

No. 187.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (L. De Grove Potter, of New York City, of counsel), for appellant.

Joffe & Joffe, of New York City (Joseph Joffe, of New York City, of counsel), for appellees.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge. Upon a finding of unseaworthiness of the ocean carrier's vessel and negligence in the stowage of a cargo of onions, the appellees recovered damages below. The vessel Florinda had a net tonnage of 1,300 tons and was classed 100 A–1 in Lloyds, was about 290 feet long, 42 feet wide, and 20 feet 7 inches deep, having two decks, three cargo holds, and five hatches. The onions were packed in crates and placed in No. 2 lower hold over bags of almonds. An air space of about one foot was left between the 'tween-decks and the top of the stow, and three air shafts of about one foot in width running athwartships and spaced about equidistant fore and aft were left in the stow. Cases of onions were stowed in the No. 2 'tween-decks in the after part over barrels of grapes, stowed two or three tiers high in the forward part of the hold. There were vacant spaces left in the square of the hatch and the forward part of the hold, and a space of about one foot above the stow. Two air shafts were left in the stow, running athwartships at about the forward and after end of the hatch opening. No. 3 'tween-decks was loaded in the same manner, with vacant space in the square of the hatch and similar air shafts at the forward and after ends of the two hatches in this compartment. No onions were loaded in the forward part of the hold. In No 3, the onions were loaded in approximately two-thirds of the compartment over tins of canned goods, and some almonds stowed above them, with an air shaft running from the bottom of the stow to the after end of the hatch. There were also air spaces between the stow and the sides of the ship, provided by permanent battens, and free space of about one foot left between the stow of the onions and the bulkheads in the various compartments. The cases were piled up pyramid fashion to prevent falling out of the stow.

The No. 2 hold extends from the bulkhead to the engine room bulkhead, and has two hatches, equipped with four telescopic ventilators; No. 3 extends from the machinery space to the after end of the vessel, with two hatches equipped with six ventilators. The ventilators were on the main deck and were from 16 to 18 inches in diameter; 'tween-decks they were 9 inches in diameter. There was no finding below that the vessel or the equipment was in any way structurally defective or that she was not well supplied with ventilators. Before the onions were loaded in the vessel, the holds were swept clean; sawdust and dunnage were laid. The vessel had permanent side battens, which prevented the cargo from coming in contact with the sides of the ship, and also provided air space for the ventilation between the side of the ship and the stow. She was not fully loaded, having a freeboard of 6 feet, 9½ inches; her assigned freeboard was 3 feet, 9½ inches.

Leaving Valencia on October 25, 1923, she arrived in New York November 13, 1923. During the voyage she experienced heavy weather, and as a result it was necessary to keep the hatches battened down and covered with tarpaulins much of the time. During part of seven days, the weather permitting, the officers opened some of the hatches. During the entire voyage, the ventilators were left open and kept properly trimmed. There were no leaks in the vessel. When she arrived in port, in discharging the cases of onions, it was observed that some were stained with grape juice, and a part were found to be diseased and condemned by the inspector of the Board of Health.

The bills of lading contained a provision exempting the vessel from leakage, breakage, heat, decay and deterioration of the onions, but the appellees base their right to recover upon the claim of unseaworthiness of the vessel and negligence in stowage. The theory of unseaworthiness of the vessel seems to be that she was not equipped with sufficient ventilators and that she did not have enough freeboard, so that the hatches might be opened during the voyage. There is ample testimony in the record that, during the North Atlantic voyage at this season of the year, even a larger vessel would expect to have her decks awash and be unable to open her hatch-

es at times. The freeboard of the vessel was in excess of Lloyds' requirements for a winter voyage on the North Atlantic. It would increase during the voyage as coal, water, and supplies were consumed. The credible testimony clearly establishes that she was seaworthy and fit for the carriage of the cargo as undertaken. Nor did she suffer undue delay in making the voyage. The distance from Valencia to New York on the southern route is approximately 4,021 miles. Her average speed was from 9 to 10 knots, and she occupied 18 days and 15 hours with adverse weather conditions. It is now well recognized that, where a loss occurs from an excepted peril, the ship is prima facie excused, and can only be held liable on affirmative proof of some negligence on the ship's part, which is an efficient cause of the loss, such as unseaworthiness. The Isla de Panay (C. C. A.) 292 F. 723; The Timor (C. C. A.) 67 F. 356; The St. Quentin (C. C. A.) 162 F. 883.

There is some evidence that during the voyage it was found that the cargo had shifted in No. 2 'tween-decks. Some 20 to 40 cases fell down. When this condition was discovered, a carpenter was sent for, who recoopered the broken cases and put them back in the pile. These may have shifted in the pitching of the vessel. But the testimony is that she did not pitch as much as she rolled. There is no proof that any of the air channels placed in the stow were filled with cargo or destroyed as such. At the end of the voyage, the air shafts were found to be in place in the stow. There is no evidence of their being blocked by the shifting of the cargo. The damage to the onions seems to have been due to decay. They were soft at the ends. There was little breakage of the cargo. The master, chief officer, assistant superintendent of the pier, together with disinterested witnesses, all testified with convincing frankness as to the ventilating spaces. One of the appellees said he looked out through one of the hatchways, and there was not sufficient space. But the weight of the testimony on this issue is strongly with the appellant. That the ventilators were sufficient is amply proved by the word of capable expert engineers and surveyors. The vessel is shown to have carried at least ten other cargoes of onions from Spain to the United States, and that, while there is the normal loss, due to decay, of from 3 to 10 per cent., still, on the last trip of the vessel, there was but 1 per cent. damage. Since the bills of lading were silent as to the condition of the onions when shipped, it was incumbent upon the appellees to show they were in good condition when shipped. The Isla de Panay, 267 U. S. 260, 45 S. Ct. 269, 69 L. Ed. 603; The Goyaz (C. C. A.) 3 F. (2d) 553. The vessel's officers said they merely saw the onions in cases as they were placed aboard. Appellees' representative inspected only the Schnell shipment, and such inspection consisted of looking at the crates as they were piled ready for shipment. To be sure, he said, by looking at them he could say they were in good condition.

A bacteriologist, who had made experiments and studies in connection with the disease of onions and fruits, testified that he examined samples of the decayed and also the apparently sound onions, finding that they were both affected with soft slimy rot and neck rot, and the only cause of such disease was bacterial or fungi infection. Onions so affected do not show any external evidence of that condition in the earlier stages of the disease. Others who had experience with onions said they found oftentimes diseased or decayed onions without any visible or external signs of such conditions. The decay here and the neck rot found is a sufficient explanation of the cause of the damage, rather than the exaggerated claims of insufficient ventilation. Heat and lack of ventilation would not have caused the disease found in the tests made. The appellees have not met the burden of establishing negligence in stowage and the care of the cargo.

Grape juice from barrels stowed two or three tiers high in the after part of No. 2 hold leaked through the hatchway into the lower hold, staining some of the cases of onions. If this was due to fermentation, resulting in the bursting of the barrels, as we think was shown, the ship would not be responsible for the resulting damage. No negligence was shown in connection with the receipt or stowage of these barrels. The bills of lading contained an exception from liability from "leakage, breakage, damage due to contact with * * * other goods." The burden of proving negligence was on the appellees, and such unusual breakage or leakage does not raise any presumption. The Arpillao (C. C. A.) 270 F. 426; The Solveig (D. C.) 217 F. 805. The explanation of the way the grapejuice came in contact with the onions, as suggested by the appellant, is that during heavy weather it was spilled on the 'tween-deck hatch, thus leaking down over the onions below, which, to us, seems more plausible than the claim that it leaked through the deck.

The decree below is reversed, with directions to the District Court to dismiss the libel.