## THE MANUEL ARNUS.

### M. BINKOVITZ & SONS, Inc., et al. v. COMPANIA TRANSATLANTICA.

District Court, S. D. New York.
April 26, 1935.

Hill & Rivkins, of New York City (Robert E. Hill, of New York City, of counsel), for libelants M. Binkovitz & Bros.

Bigham, Englar, Jones & Houston, of New York City (Alfred Ogden, of New York City, of counsel), for libelants J. H. Rossbach & Bros.

Hunt, Hill & Betts, of New York City (John W. Crandall and Frank J. Zito, both of New York City, of counsel), for respondent and claimant.

HULBERT, District Judge.

These are two suits in admiralty embracing five claims for cargo damage against the Spanish steamship Manuel Arnus and her owner, a common carrier.

On January 31, 1931, Ferrer y C. Ctas shipped 16 cases of cotton cloth marked M. B. S. and delivered same to the respondent at Barcelona, Spain, for transportation to New York. M. Binkovitz & Sons, Inc., a New York corporation of 458 Broadway, borough of Manhattan, city of New York, as consignee, is one libelant.

On February 7, 1931, Juan Panisello shipped 50 drums of olive oil, 25 marked J. P. and 25 marked C., and delivered same to the respondent at Tarragona, Spain, for transportation to New York. The General Olive Oil Corporation, a New York corporation of 136 Liberty street, borough of Manhattan, city of New York, as consignee, is another libelant.

On February 5, 1931, Jaime Hugas Comas shipped 160 bales of dried lambskins and delivered same to the respondent at Barcelona for transportation to New York. J. H. Rossbach & Bros. Inc., a Delaware corporation of 100 Gold street, borough of Manhattan, city of New York, as consignee, is another libelant.

On February 4, 1931, Andres Rosa shipped 215 cases of castile soap and delivered same to the respondent at Barcelona for transportation to New York. H. L. Sherer, doing business under the tradename and style of Yarritu Castile Soap Importing Company, of 207 Water street, borough of Manhattan, city of New York, as consignee, is another libelant.

On February 7, 1931, Miguel Alimbau Minguell shipped 25 cases of pine kernels and delivered same to the respondent at Tarragona for transportation to New York. Specialty Confectioners' & Bakers' Supply Company, Inc., a New York corporation of 192 Third avenue, borough of Manhattan, city of New York, as consignee, is another libelant.

It is conceded that libelants have the legal status and are the proper parties to sue.

Bills of lading for the carriage of the merchandise above referred to contained, among others, the following clause: "7. The Company is not responsible for damages or losses caused by the sea, the winds * * * or any unforeseen cause * * *. Also not responsible for the contents, weight and quality of the packages; for damage caused by other goods; * * * not for breakage of the articles and fragile containers."

The bill of lading issued for the drums of olive oil contained in addition the following stamped clause on the face thereof: "I do not know the weight and contents and not responsible for damages, hook holes or leakage."

It is conceded that the shipment of olive oil was received on board in external good order, except that the drums may have been secondhand or old containers, and all of the other merchandise was received in apparent good order on the steamship Manuel Arnus, which is a steel vessel, built in May, 1923, 435 feet long, 56 feet beam, and 29.1 feet in depth, 7,578 gross and 4,402 net tons, classified in Lloyds' Register as A1.

The Manuel Arnus loaded at Barcelona, Tarragona, Valencia, Alicante, Malaga, Cadiz, and Vigo, Spain, and sailed from the last-named port February 14, 1931, at 8 p. m., and arrived in New York February 26, 1931, 2½ days late, which delay is alleged to have been due to bad weather on February 21st, February 22d, and February 23d.

The Manuel Arnus carried a miscellaneous cargo in her Nos. 3 and 4 'tweendeck compartments. No. 3 was directly forward of the engine room amidships, and No. 4 was directly aft. Both were 6 feet 6 inches in depth and extended the width of the ship (56 feet), but No. 3 was about 50 or 60 feet long, while No. 4 was about 40 feet long.

There was some conflict with respect to the stowage of the cargo in question, but from the evidence I believe it all to have been stowed in No. 3 compartment under the direction of Chief Cargo Officer Aguirre.

On the outer corner of each aft side pocket of compartment No. 3 was a scupper. Aguirre testified these scuppers were cleaned out by the sailors and thereafter inspected by him, and he believed the drainpipes leading from the 'tweendecks were clean, free, and clear for any sort of drain but there was no hose test.

Cargo battens in No. 3 compartment were fitted at sides of ship and spaced 2 feet apart.

Eighty drums of olive oil were stowed two tiers high a little aft to center of compartment No. 3. The drums, which were constructed of steel, were of uniform size, 3 feet high and 2 feet in diameter, stood on their heads in the lower tier and in the upper tier lay horizontally fore and aft, in three rows or longers, except in one place where there were four longers. It does not appear just where in said No. 3 compartment the cases of cotton cloth and soap were stowed, but between the drums of olive oil and the aft bulkhead, bales of sheep and/or lambskins, general cargo, and case goods were stowed, and there was 2 feet space between drums and other cargo fore and aft except, where the stowage was broken on account of the four longers of drums, the lambskins and general cargo were used to fill up the broken tier. Similar cargo was stowed forward of the drums of oil.

At one point of respondent's case it was testified that about 2½ inches of dunnage was laid down under all cargo. Pieces of wood and boards were placed between the upper and lower tiers of drums of olive oil; large packages were stowed at the bottom and small packages above, but there was no cargo atop of the drums; 2-inch boards

were used wherever necessary to keep smaller packages away from drums of oil, but temporary bulkheads were not installed to secure the drums and there was no lashing, chocking, or tomming of the drums. The testimony is very indefinite and uncertain and unsatisfactory regarding the use of dunnage, particularly to secure the drums. It was testified by Captain Pilcher, a cargo surveyor and a witness for the respondent, who examined the vessel upon her arrival in New York, that the cargo was properly stowed, although he admitted it would have been proper, if not preferable, to have set all drums on end and placed cargo on top of them; in which Mr. Cocks, a cargo surveyor called as an expert by the libelants, did not concur. The latter insisted, however, that it was improper stowage to place the olive oil in the same compartment with general cargo, although he had given testimony somewhat at variance in the Cabo Hatteras Case (D. C.) 5 F. Supp. 725, 1933 A. M. C. 1587, and had given certificates of good stowage on ships from Mediterranean ports to New York with drums of oil stored in compartments with general cargo.

It might be mentioned that 200 drums of olive oil were stowed end up in three tiers in No. 4 compartment—and also leaked—while there were *barrels* of olive oil in the lower hold which did not leak at all.

Also Mr. Cocks agreed with Messrs. Pilcher and Nicholson that olive oil in steel drums had no normal leakage contrasted with *barrels,* although Chief Cargo Officer Aguirre testified there was always some leakage from steel drums which would indicate the need for greater care in providing proper dunnage, chocking, tomming, lashing, and securing the drums especially at that particular season of the year to avoid chafing and prevent leakage.

The Manuel Arnus encountered bad weather from the Azores a week out of Vigo. From 4:30 a. m. on February 21st to midnight on February 23d she hove to and reduced her speed from 13–14 knots to 4–5 knots; she was buffeted by heavy seas and her decks were washed by high waves. The master emphasized that a teakwood rail 35 or 40 feet above the water line, 15 or 20 feet long, was knocked out of place, which the chief officer did not consider of any great import. The captain testified that the boatswain was carried almost the length of the main deck of the ship, which appears to me to be one of those exaggerations some-

times characteristic of the officers of a vessel, indicating their zeal "to stick by the ship." The ship's doctor testified the boatswain's injuries were slight.

Respondents placed in evidence "Weather of the Oceans," reprinted from a monthly weather review of February, 1931, showing that steamship Asia on February 17th (Lat. 33.40 N., Long. 41.30 W.) reported a wind force on the Beaufort scale of 11; steamship Carpeka on February 18th (Lat. 57.19 N., Long. 26.30 W.) reported 10; steamship Liberty on February 21st (Lat. 36.14 N., Long. 61.58 W.) reported 12; the Exmouth on February 21st (Lat. 36.10 N., Long. 53.00 W.) reported 11. The Manuel Arnus on February 21st was at Latitude 37.24, Longitude 51.55; on February 22d, Latitude 37.24 N., Longitude 53.55 W.; February 23d, Latitude 37.52 N., Longitude 57.00 W. According to the Weather of the Oceans map, on February 22d the wind force at the approximate position of the Manuel Arnus indicates 7, and on February 23d only 5, on the Beaufort scale, although there is an indicated wind force of 11 and 12 at a considerable distance from the location of the Manuel Arnus according to her log.

Quoting from Weather of the Oceans: "February is normally one of the stormiest months of the year over the North Atlantic, and the conditions during the current month could not be called exceptional, although there were a number of severe disturbances that will be referred to later. The number of days with gales was not far from normal west of the 40th meridian north of the 30th parallel and somewhat below over the middle and eastern sections of the steamer lanes."

Only three days of extraordinary weather are claimed by the respondents out of ten. The chief officer had experienced equivalent wind forces 30 or 40 times, and the third officer had encountered similar weather before in from 10 to 20 trips out of 135. The chief engineer characterized the weather as "bad" when asked if it had been "exceptionally bad." No scrap log was kept. Entries in smooth log showed commendable penmanship (if made at the time considering condition of weather complained of by the respondent).

The real question in the case is whether the loss is attributable to the perils of the sea or to the un-cargo seaworthiness of the vessel.

In The Warren Adams (C. C. A.) 74 F. 413, 415, the court said that the term "perils of the sea" may be defined as denoting "all marine casualties resulting from the violent action of the elements, as distinguished from their natural, silent influence, upon the fabric of the vessel; casualties which may, and not consequences which must, occur."

In The Giulia (C. C. A.) 218 F. 744, 746: "Perils of the seas are understood to mean those perils which are peculiar to the sea, and which are of an extraordinary nature or arise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence."

In Duche et al. v. Thomas & John Brocklebank, Ltd., et al., 40 F.(2d) 418, 419 (C. C. A. 2d), *the vessel encountered a ten-day period of squalls, strong winds of moderate to fresh gale velocity, reaching hurricane violence.* The court said: "We think such uncertain and unpreventable action of the elements falls within the peril of the sea exception * * * as that phrase is defined in The Rosalia (C. C. A.) 264 F. 285, * * * 'that the peril which forms a good exception in a bill of lading means something so catastrophic as to triumph over those safeguards by which skillful and vigilant seamen usually bring ship and cargo to port in safety.' * * * The difficult task is not to define in general terms a peril of the sea, but to determine whether some established facts and circumstances, like those proved in this case, fall within a sound definition. There opinions may be at variance and give to close cases little value as precedents. Yet this situation obtains largely throughout the whole administration of justice because it is impossible to do away entirely with the human element in applying the law to the facts."

In my opinion, the weather must be irresistible, overwhelming, and extraordinary for the particular time of year to be a good exception and not a common occurrence at that season of the year. The Orcadian (D. C.) 116 F. 930; The Rappahannock (C. C. A.) 184 F. 291; The Governor Powers (D. C.) 243 F. 961.

Accordingly, I hold that the respondent has not discharged by a fair preponderance of the evidence the burden of proof that the damages in question occurred by reason of the peril of the sea.

In The Southwark, 191 U. S. 1, at page 11, 24 S. Ct. 1, 4, 48 L. Ed. 65, it was said: "Cargo, seaworthiness is that quality of a ship which fits it for carrying safely the particular merchandise which it takes on board. A ship is impliedly warranted to be seaworthy quoad that article." And further, 191 U. S. 1, at page 16, 24 S. Ct. 1, 6, 48 L. Ed. 65: "If * * * the question of the ship's efficiency is left in doubt, that doubt must be resolved against the shipowner, and in favor of the shipper."

In The Mississippi (D. C.) 113 F. 985: *The evidence established great severity of weather on the voyage.* Glycerine was stowed in the orlop deck of No. 1 hold and the damaged cargo in No. 1 lower hold under the glycerine. When the vessel arrived in New York, it was found that a number of the drums were chafed through and empty; the glycerine having escaped so that it was from 6 inches to a foot deep on the orlop deck and had washed over the coamings of the hatch of that deck upon the cargo in the square of the hatch below. The drums had been dunnaged and chocked when stowed, but not tommed or fastened down to prevent a vertical movement in heavy weather. Nor were the drums protected by a bulkhead to prevent fore and aft motion. The dunnage and chocks were not sufficient to secure the drums and they became loose. The dunnage and chocks, being broken up in small pieces and strewn all over the deck, formed a pulpy mass which got into the scupper pipes, preventing the escape of the glycerine in that way to the bilges of the ship, and thus causing the washing of the glycerine over the coamings of the hatch. The court found that proper precautions were not taken by the vessel.

It is established by the proofs in this case that the cargo was not properly stowed, which was the direct cause of the chafing and leakage of the drums of olive oil, and that the scuppers likewise failed to perform their functions. See Atlantic Sugar Refineries v. Royal Mail Steam Packet Co. (C. C. A.) (The Chaudiere) 47 F.(2d) 880, 1931 A. M. C. 533; The Orcadian (D. C.) 116 F. 930; Knohr et al. v. Pacific Creosoting Co. (D. C.) 181 F. 856; The Frederick Luckenbach (D. C.) 15 F.(2d) 241, 1927 A. M. C. 143; The Cornelia (D. C.) 15 F.(2d) 245 (Thacher, J.); The J. L. Luckenbach (D. C.) 1 F. Supp. 692, 1933 A. M. C. 105, affirmed (C. C. A.) 65 F. (2d) 570, 1933 A. M. C. 980.

There is proof in the case that the lambskins were also affected by iron or steel rust.

In The Vallescura (Schnell v. The Vallescura), 293 U. S. 296, at page 305, 55 S. Ct. 194, 196, 79 L. Ed. ——, it was said: "If he delivers a cargo damaged by causes unknown or unexplained, which had been received in good condition, he is subject to the rule applicable to all bailees, that such evidence makes out a prima facie case of liability. It is sufficient, if the carrier fails to show that the damage is from an excepted cause, to cast on him the further burden of showing that the damage is not due to failure properly to stow or care for the cargo during the voyage."

There will be a decree for the libelants, and findings in accordance with this opinion may be submitted in compliance with Admiralty Rule 46½, 28 USCA following section 723.