45 F.Supp. 813 (1942)
THE SCHICKSHINNY.
JOHNSON et al.
v.
S. S. SCHICKSHINNY et al.
LANCASHIRE COTTON CORPORATION LIMITED, et al.,
v.
SOUTH ATLANTIC S. S. CO. OF DELAWARE.
Nos. 464, 465.
District Court, S. D. Georgia, Savannah Division.
June 4, 1942.
*814 Hill, Rivkins & Middleton, of New York City, and Wm. Hugh Stephens, of Savannah, Ga., for W. H. Johnson and others.
Anderson, Cann & Dunn and Jas. P. Houlihan, Jr., all of Savannah, Ga., for Lancashire Cotton Corporation.
Lawton & Cunningham, of Savannah, Ga., for respondents.
LOVETT, District Judge.
Two groups of cargo-owners have brought these libels in admiralty, one in rem and the other in personam, against the S/S Schickshinny and her owner for damage to lumber and cotton being carried from American South Atlantic ports to Liverpool, England. They charge breach of contract to safely transport and deliver, in that, delivered to the ship in good order and condition, the bills of lading so reciting, the goods at destination were damaged.
The defenses are that the ship encountered very severe weather on the voyage, other cargo shifted and caused the damage, and Sec. 1304(2) (c) and (q) of the Carriage of Goods by Sea Act, 46 U.S. C.A. § 1300 et seq., is pleaded. This is the section which relieves the carrier and the ship from liability resulting from "perils * * * of the sea", etc., or arising from other causes without actual fault and privity of the carrier, its agents and servants.
The cases were heard and may be decided together.
If 150 barrels of "prime steam lard" on board the ship were badly stowed and, because of the fault of the ship in this respect, they shifted, broke loose and came adrift, liability for the consequent damage to the cotton and lumber with which it came in contact should be fixed on the ship; otherwise, not  for it was the lard that caused all the trouble.
The 150 wooden barrels, with oak staves and oak or ash heads, in which the lard in a liquid state was packed, each containing 395 pounds, were received without any exceptions noted, being stowed two *815 tiers high, at Jacksonville, Florida, and were re-stowed on end at Charleston, South Carolina, whence the ship sailed for Liverpool in the early part of March. The method of stowage must be given in some detail to understand what happened to the cargo.
The lard was placed in the after part of No. 2 'tween-deck. Part of the cotton damaged was stowed in the forward part of the same compartment, some in No. 1 lower hold and the balance in No. 2 lower hold  the holds being below the 'tween-deck. The ship was equipped for refrigeration but the chilling apparatus was not in use. As a part of such equipment it had trunkways near the center of the 'tween-deck compartments, described as "similar to an elevator shaft", which extended from the weatherdeck through the 'tween-deck space, and enclosed hatches Nos. 1 and 2, respectively. The one in No. 2 'tween-deck measured fore and aft 25 feet and 3 inches, and port to starboard 27 feet and 9 inches, and was of steel construction, with about one foot of insulation. There were doors on the port and starboard sides of the trunkway, also insulated, opening towards the hatches. The hatches were not battened down. The 'tween-deck compartment was 7 feet and 5 inches high, 46 feet long and 48 feet wide. The wings on each side of the trunkway were 12 feet and 3 inches across.
The lard started at the aft steel bulkhead and went all the way across the ship and forward for seven or eight rows, one tier high, to within five or six feet of the trunkway. Forty pieces of heavy pine lumber[1] were stowed in the after part of No. 2 'tween-deck just forward of, and where touching flush with, the lard. This lumber extended all the way across the deck athwartships, abaft of the trunkway, and was chocked at the ends where it touched the skin of the ship. Other lumber was in the forward part, and some in No. 1 lower hold. The boards or planks immediately forward of the lard were 10 inches wide and 4 inches thick and were of random lengths varying from 4 to 18 feet. Where the boards of lumber touched the barrels of lard the stow was practically as high as the barrels, but from that point forward it was "stepped down" until at the trunkway it was only one plank high. Dunnage was piled on top of the lumber. The lumber and dunnage filled the space between the most forward row of the barrels of lard and the trunkway, and together were almost level with the barrel heads, but the wings on each side of the trunkway were empty. Though the lumber went all the way across the compartment from skin to skin of the ship, there was nothing immediately in front of that part of the lumber which was stowed aft of the two wings. At Savannah lumber was loaded on the forward end of No. 2 'tween-deck,  in the wings on each side of cotton received on board at Jacksonville. This lumber and cotton extended all the way across the deck and the stow came up to the deck above. There was vacant deck space in the wings of the trunkway between the cargo forward and the cargo aft.
When the ship arrived at Charleston, where the master expected to completely fill No. 2 'tween-deck with other cargo, he was informed by the stevedore that there was no other cargo to receive except the 40 large pieces of lumber, and the stevedore suggested that the lard be re-stowed one tier high, which was done. The lard remained aft in the compartment as before, though necessarily as re-stowed it occupied more deck space, and was stowed wing to wing hard up against the after bulkhead. It took up all of the space to within about five or six feet of the trunkway and that space was filled in by the 40 pieces of lumber taken aboard at Charleston, which, as stated, were of random lengths and were stepped down from the lard to the trunkway. The wings on each side of the trunkway remained empty. In stowing the barrels from wing to wing there was a space of two or three inches from the barrels to the wings which was filled by shoring it off with regular hardwood dunnage boards usually used by ships. The barrels were hard up to each other but, tapering at each end, cordwood was dropped between the barrels where they did not touch, inserted at the top horizontally. Neither the barrels nor the lumber just forward of them were "tommed" by putting pieces of wood from the top of the stow to the ceiling of the deck. Nor were they buttressed fore and aft except by the trunkway. The lumber was to serve as a bulkhead forward for the lard. Long pieces of the lumber were put at bottom; shorter lengths on top.
According to the chief officer, the bottom boards did not move during the voyage. *816 Lumber laid fore and aft, or when a complete, full stow, stows itself. This lumber, however, was athwartships. The chief officer and the third mate (a brother of the master) carefully inspected the stow at Charleston after completion, because one of the ships of the line previously had loaded lard which became damaged through seepage on board. They considered the cargo well stowed. Other like cargo consisted of tar in drums, turpentine, rosin and tobacco in barrels or hogsheads, stowed on the sides, none of which shifted on the voyage.
On March 30th, about 7:30 a. m. when the ship was one day out from Liverpool, the chief officer was sent by the master down to No. 2 'tween-deck, where an odd noise had been heard. All he could see was "lard, staves, hoops and bands, swishing back and forth." The barrels had completely broken up and the loose lard in liquid form was three or four feet deep on the deck[2]; a door in the trunkway was sprung and partly open, and some of the insulation was broken off. The cotton and lumber in the compartment with the lard were completely covered by it. All of the cargo in that space had shifted.[3] The lard also had leaked into the trunkway, through the open door, down the hatch and into the lower holds, damaging more cargo there. On discovering this condition water was taken from the forepeak tank causing the stern to go down 12 or 14 inches in an unsuccessful effort to run the lard down the scuppers in the after part of No. 2 'tween-deck into the bilges. Nothing could be done at that time about re-stowing the cargo.
On the previous day, March 29th, one of the sailors heard a noise in the No. 2 'tween-deck and went down to ascertain the cause of it. He found one of the small doors on an air-duct had come off its latch, and he fixed it. He reported everything otherwise was in order.
The ship sailed from Charleston March 18th at two o'clock a. m., and arrived at Liverpool at eight o'clock a. m. on April 1st. The voyage normally took eleven to twelve days  this voyage took more than 13 and one-half days. The third officer, the master's brother, testified the bad weather was not any worse than was to be expected at that time of the year on that run. Yet severe weather was encountered. March is a bad month, a bad part of the year, in the North Atlantic. The master and the chief officer, each with 22 years experience at sea, in characteristic fashion[4] described it as one of the most severe storms they had ever witnessed[5]. A pipe guard on the forward well deck was broken, four or five feet washing away, and a bulwark or ship's plating was cracked about 15 by 18 inches on the forward starboard side of the ship. No other part of the ship was damaged, and no other cargo shifted except the lard, lumber and cotton in 'tween-deck No. 2. Because of high winds and high seas the Schickshinny, on March 30th from 7:30 a. m. to 4:40 a. m. of March 31st, was on reduced speed and hove to. According to the smooth log, on March 30th the wind, which on the previous day had been blowing fresh gale force, rose in the forenoon to whole gale force, Beaufort scale 10, which means 55 to 63 miles per hour. At 4 a. m. and 8 a. m. the force was 10 (55 to 63 miles); at noon 11-12 (64 to 75 miles and above); at 4 p. m. 11 (64 to 75 miles); and at 8 p. m. 11-12; and at midnight 11. On the previous day (when the sailor went below and found the cargo in question in order) the velocity did not exceed 46 miles per hour. When hurricane gales were blowing the ship hove to and changed her course to ease her up. At 7:30 a. m. on the 30th, before the wind had reached hurricane force, the odd noise below was heard in No. 2 'tween-deck, and the cargo there was then found broken up as described.
*817 The Carriage of Goods by Sea Act provides "the carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried[6]", and that a bill of lading shall be issued on demand of the shipper showing the apparent order and condition of the goods received into his charge which shall constitute "prima facie evidence" of the receipt of the goods in the condition stated[7]; among the rights and immunities of the ship granted by the act are certain exemptions of liability for named "uncontrollable causes of loss", including "perils, dangers, and accidents of the sea" and "loss or damage arising or resulting from * * * any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage"[8] (emphasis mine).
Whatever doubt may have previously existed under the Harter Act[9], or before its enactment, as to where the burden of proof rested in a case of this character[10], it now seems plain that where the bill of lading recites the goods were received in good condition and it appears they were delivered in a damaged condition, as here, the duty is cast on the carrier to show facts that grant him immunity. The Asturias, D.C., 40 F.Supp. 168, 173; Mente & Co. v. Isthmian S. S. Co., D.C., 36 F.Supp. 278, 283, 284, affirmed The Quarrington Court, 2 Cir., 122 F.2d 266. This I find the respondent-claimant has failed to do.
Owners of vessels are not liable if loss to cargo comes without negligence and due solely to "a peril of the sea". Automobile Ins. Co. v. Hart-Wood Lumber Co., 9 Cir., 105 F.2d 387(2), 389. Whether one accepts the more vivid and rhetorical definition of Judge Hough in The Rosalia, 2 Cir., 264 F. 285, 288, or the less colorful ones of Judge L. Hand in Philippine Sugar Centrals Agency v. Kokusai Kisen, etc., 2 Cir., 106 F.2d 32, 34, 35, and of Judge Chase in Duche v. Thomas & John Brocklebank, 2 Cir., 40 F.2d 418, 419, 420, as to what constitutes a "peril of the sea", the evidence as to the peril in this case remains unsatisfactory. Apparently the ship's officers had little recollection of the weather unaided by the log. They differed among themselves as to when the most severe weather was encountered. One officer, as already stated, said the weather was no worse than was to be expected on that voyage during that season of the year. The damage to the ship was slight. No cargo except that in controversy shifted, came adrift or was damaged, though other barrel cargo was aboard. The chief officer and third mate agreed in their testimony March is a bad month in the North Atlantic, heavy weather is to be expected. The damage was done and found on March 30th, before the hurricane force of the wind arrived. Unquestionably, rough weather and heavy seas were encountered, but where a vessel is subjected to no greater risk or damage than reasonably might have been anticipated on the voyage, peril of the sea furnishes no immunity. The Edwin I. Morrison, 153 U.S. 199, 211, 14 S. Ct. 823, 38 L.Ed. 688; The Arakan, supra, 11 F.2d at page 791; The Rappahannock, 2 Cir., 184 F. 291; The Manuel Arnus, D.C., 10 F.Supp. 729 affirmed 2 Cir., 80 F.2d 1015; Franklin Fire Ins. Co. v. Royal Mail Steam Packet Co., 2 Cir., 58 F.2d 175, 176, 177; The Skipsea. 2 Cir., 9 F.2d 887, 889; The Mongolian Prince, D.C., 27 F.2d 985, 986(5), 987; Norris Grain Co. v. Great Lakes Transit Corp., 7 Cir., 70 F.2d 32(2), 35; The Emilia, D.C., 13 F.Supp. 7(2), 8; Atlantic Transport Co. v. Rosenberg Bros. & Co., 9 Cir., 34 F.2d 843, 845(2); The Erskine M. Phelps, D.C., 231 F. 767(3), 768, 769; Maryland Trans. Co. v. Dempsey, 4 Cir., 279 F. 94, 95; The City of Khios, D.C., 16 F.Supp. 923(3), 924.
If the severe weather should be regarded as so unusual, unexpected, and "catastrophic as to triumph over those safeguards by which skillful and vigilant seamen usually bring ship and cargo to port in safety"[11], or if we substitute the *818 words "of such a character" for "catastrophic"[12], the ship is still liable if its negligence contributed to the loss. Compania de Navigacion La Flecha v. Brauer, 168 U. S. 104, 118-123, 18 S.Ct. 12, 42 L.Ed. 398; Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 438, 9 S.Ct. 469, 32 L.Ed. 788; Liverpool & G. W. Steam Co. v. Insurance Co. of North America, 129 U.S. 464, 9 S.Ct. 480, 32 L.Ed. 800; The G. R. Booth, 171 U.S. 450, 459, 460, 19 S.Ct. 9, 43 L.Ed. 234; The Nith, C.C., 36 F. 383, 384; Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304(2) (q). Where negligence contributes it is regarded as the proximate cause. Texas & Gulf S. S. Co., v. Parker, 5 Cir., 263 F. 864, 868 and cases cited; Atlantic Sugar Refineries v. Royal Mail Steam Packet Co., 2 Cir., 47 F.2d 880(2) (6), 882. The ship has not only failed to carry the burden of showing proper stowage, but, in my view, the evidence affirmatively shows the stowage was bad, negligent.
It is not necessary to say that stowing this liquid cargo of lard in the same compartment with, and above, dry cargo was of itself negligence, though the authorities on stowage regard it is better not to place such goods above or in too close proximity to dry cargo. Stevens on Stowage (5th) p. 456; Carver on Carriage of Goods by Sea (6th) Sec. 95. Negligence as an inference of fact is by some courts held to be established where dry cargo is damaged by liquid goods. The C. Lopez y Lopez, 2 Cir., 297 F. 457(2), 458; The Mississippi, D.C., 113 F. 985, affirmed 2 Cir., 120 F. 1020; Atlantic Sugar Refineries v. Royal Mail Steam Packet Co., supra; The H. G. Johnson, D.C., 48 F. 696. See contra the Cabo Hatteras, D.C., 5 F. Supp. 725, 727, 734, 735; The Florinda, 2 Cir., 31 F.2d 262, 264(4, 5). But the cargo of lard was not well secured if properly placed. To begin with, it was stowed on end. Most liquid cargo in wooden barrels, notably spirits of turpentine, the evidence discloses, is stowed on the side or bilge, with quoins underneath the quarter hoops[13]. As a barrel is higher than thick, this seems sound, for the center of gravity is thus lowerednearer the deckand the weight of the thing itself is better distributed, all of which makes for stability in place. The barrels were not tommed from the ceiling of the compartment, the deck above. The expert witnesses (stevedores) differ in their testimony as to the necessity for tomming. Where the stow is broken (the compartment not completely filled) tomming would have made it more secure, in my opinion. Worse than these things, however, was the placing of the lumber of random lengths athwartships forward of the lard, as for a bulkhead, stepped down to one plank high immediately aft of the trunkway, and leaving the wings on each side of the trunkway entirely empty. True the planks were put butt to butt and chocked with cordwood at the ends where they touched the skin of the ship, and true also dunnage was loosely placed above the stepped down lumber until the top surface was almost even with the barrel heads. Being of random lengths, varying from 4 to 18 feet, it is quite likely that some of them at least were not made secure at both ends, viz, at the trunkway and at the ship's side, because they could not reach that far. Pressure, where not secured, from the barrels of lard would tend first to throw the stepped down lumber forward towards the trunkway row by row, and also to push it forward in the empty wings. Once dislodged, with one barrel loose, the integrity of the stow was destroyed. There were still other things, it seems to me, which careful stowage would have suggested. A temporary bulkhead could have been constructed immediately forward of the lard, something more permanent than lumber with loose dunnage. While lumber fore and aft stows itself when a complete cargo, the same can not be said of it when stowed athwartships, stepped down, and serving as a bulkhead for a broken stow. The lard could have been buttressed also in some manner from the more solid cargo, lumber and cotton, in the forward part of the same *819 compartment, which reached across the ship and from the deck to the ceiling. None of these things was done.
The respondent shipowner urges earnestly that the real cause of the damage was faulty barrels in which the lard was packed, and by the exercise of due diligence the ship's officers could not have discovered their condition. Evidence was taken concerning other shipments via the same line packed in like barrels, and it was shown that they leaked or seeped through the grain of the wooden staves to such an extent they had to be unloaded and re-coopered or re-packed in other barrels before the ships broke ground at the port of departure. The theory thus developed is that the pressure of the liquid lard within the barrels was so great that it forced itself out through the pores of the oak staves (though they are the least porous of all woods used for the purpose), or that the lard oozed through the seams, bungs and heads of the barrels, loosened the hoops, and caused the barrels to collapse. It is argued that the lumber then fell backward into the lard, or that some part of it did, and thus the demolition began. It may have happened that way, but I do not think so. No one saw the cargo at or when it shifted, and we are left somewhat to deduction or inference. It seems to me more reasonable to believe that the lumber serving as a bulkhead for the lard shifted because insecurely stowed than that the barrels collapsed as a result of inside pressure from the lard. The manufacturer of the lard testified space was left in the barrels for expansion. They did not become overheated so as to cause undue expansion. They were placed 'tween-decks because it was cooler there. The barrels were of the finest quality, well made, well coopered. Some of the ship's officers said they were clean and dry when received on board. The stevedores at Charleston said the barrels were in good order, "looked like brand new" when re-stowed[14]. The theory of collapse from inside pressure appears untenable. It is different as to the lumber. It could have moved where not secured while the lard was still intact. Pressure was constantly applied to it for it was a bulkhead. As the ship pitched in heavy seas the barrels probably hammered the nearest row of lumber continously, striking a blow with each successive movement, and bad weather, though not so severe as on March 30th, lasted for many days. Stepped down as it was, and with empty space in the wings, I see nothing under these circumstances that would prevent the lumber shifting. Other barrel cargo on the ship more carefully stowed was not damaged. Rough weather in this season of the year in the north Atlantic was to be expected and corresponding care in stowage was required. Though shifting and breakage of cargo does not necessarily demand an inference of negligence, the combined circumstances narrated, as I visualize the conditions aboard the ship, do show negligent stowage contributing to the damage. See Atlantic Sugar Refineries v. Royal Mail Steam Packet Co., supra; Clark et al. v. Barnwell et al., 12 How. 272, 53 U.S. 272, 279, 280, 13 L.Ed. 985; The Manuel Arnus, D.C., 10 F.Supp. 729, 732, 733; Bingham v. Osaka Shosen Kaisha, D.C., 12 F.Supp. 35(3.7); Lazarus v. Barber, D.C., 124 F. 1007, affirmed 2 Cir., 136 F. 534; Hodgson & Co. v. Royal Mail Steam Packet Co., D.C., 33 F.2d 337; The Orcadian, D.C., 116 F. 930; The Cimbria, D.C., 13 F. 89; The Charles Rohde, D.C., 8 F.2d 506, 507.
The doctrine of Clark v. Barnwell, 12 How. 272, 53 U.S. 272, 13 L.Ed. 985, is invoked by respondent. That case holds only that while the onus probandi is on the ship to show that the injury is occasioned by a cause excepted in the bill of lading, the burden may shift to the cargo owner when evidence comes in establishing that fact. Still the ship is liable if the injury might have been avoided by the exercise of reasonable skill and attention by the carrier, or if, on the whole, it be left in doubt what the cause of the injury was; see 12 How. pages 279, 280, 53 U.S. pages 279, 280, 13 L.Ed. 985. Cases like The Musselcrag, D.C., 125 F. 786 (violent storms opening seams in the deck); The Titania, D.C., 19 F. 101 (spare propeller stowed in the usual manner and no known and usual precautions omitted); The Cabo Hatteras, D.C., 5 F.Supp. 725 (a suit involving the American Fire Statute of March 3, 1851); The Connaught, D.C., 32 F. 640 (casks weak; no proof of bad stowage), are distinguished by their facts. *820 Crowell v. Union Oil Co., 1 Cir., 107 F. 302, and The Florinda, 2 Cir., 31 F.2d 262, holding burden of proof on cargo owner to show negligent stowage, were decided before 1936 when the Carriage of Goods by Sea Act was enacted, and also seem to me contrary to the weight of, and better decided, cases. I am unable to follow the reasoning in The Fern Holme, D.C., 24 F. 502, and like cases relied on by respondent.
Lastly, it must not be forgotten, unlike The Chester Valley, 5 Cir., 110 F.2d 592, where inherent vice of the cargo damaged was claimed, it is not the owner of the lard who is suing here. Other cargo owners, who had nothing to do with the packaging of the lard, and who are therefore innocent and without fault, are the only persons now seeking to recover their loss. They had no more control over the method of packing than the method of stowing the lard.
There remains only the amount of damages, and by consent this question is not now before the court. If the parties are unable to agree, further evidence may be submitted on that issue only. Meanwhile no final decree will be entered.
Findings consistent with this opinion, in accordance with Admiralty Rule 46½, 28 U.S.C.A. following section 723, may be submitted by proctors for libellants now or on final decree.
NOTES
[1] Some of the ship's officers said it was hardwood; the chief officer said pine.
[2] The chief officer said all the barrels had broken up; the third officer said one barrel was whole and one empty, balance completely demolished.
[3] The chief officer being recalled some 18 months after first testifying by deposition that the whole cargo in No. 2 'tween-deck had shifted qualified his previous testimony by saying only one-third of the lumber had shifted. His testimony in other respects was contradictory of other officers, and in many respects was vague and inconclusive.
[4] Courts judicially notice, at times, the disposition of ship's officers giving testimony "to stick by the ship". The Horaisan Maru, D.C., 5 F.Supp. 311, 314; The Benjamin Noble, D.C., 232 F. 382, 394.
[5] This defense has been called "the carrier's best, though least dependable, friend". The Arakan, D.C., 11 F.2d 791.
[6] 46 U.S.C.A. § 1303(2).
[7] 46 U.S.C.A. § 1303(3) (4).
[8] 46 U.S.C.A. § 1304(2) (c), (q).
[9] 46 U.S.C.A. § 190 et seq.; The Benjamin Noble, D.C., 232 F. 382(2), 389; The Rappahannock, 2 Cir., 184 F. 291.
[10] See The Toyohashi Maru, D.C., 13 F.2d 871(1), 872.
[11] The Rosalia, supra [264 F. 288].
[12] Duche v. Thomas & John Brocklebank, supra.
[13] The master of another ship of this line, the "Fluor Spar", stowed a similar shipment of lard loaded at Jacksonville for Glasgow on the bilge two tiers high, well dunnaged, and his method was approved by the New York Board of Underwriters. However, it leaked and had to be re-coopered. Touching practically the same ports on this side as the Schickshinny he discovered the leaks and repaired the damage before sailing. No explanation has been offered as to why the master of the Schickshinny by exercise of proper diligence could not have made the same discovery before sailing if there was seepage or leakage.
[14] The third officer of the Schickshinny testified the lard in question here had leaked before it was put aboard, lard was on the outside of the barrels, but that the leaks had stopped, "they filled up", and no exception was taken, though the barrels were "slippery".