THE NORTE.

No. 21 of 1945.

District Court, E. D. Pennsylvania.

Feb. 10, 1947.

882

Krusen, Evans and Shaw, by Thomas E. Byrne, Jr., all of Philadelphia, Pa., and Hill, Rivkins & Middleton, by Arthur O. Louis, all of New York City, for libellant.

Rawle & Henderson, by Harrison G. Kildare, all of Philadelphia, Pa., for claimant-respondent.

KALODNER, Circuit Judge.

This libel arises out of the discharge in a damaged condition of part of a shipment of tartaric acid powder transported aboard the steamship "Norte" from Barcelona, Spain, to Philadelphia, the port of discharge. The responsibility for the alleged damage is the ultimate issue, and attending it is the question common to cargo damage actions, the propriety of the handling, stowing, carrying, keeping and caring for the cargo, but here, the claimant-respondent also raises a question relating to the existence of damage for which recovery may be had.

The cause having been heard by the Court without a jury, on the basis of the pleadings and the evidence, I make the following

Findings of Fact.

1. At all material times, Emerson Drug Company, the libellant herein, was a Maryland corporation, and was the owner of the tartaric acid powder involved in this action.

2. At all material times, the steamship "Norte" was a general ship engaged in the common carriage of merchandise upon the high seas for hire between ports in Spain and the port of Philadelphia.

3. At all material times, claimant-respondent Domingo Mumbru was and is a citizen and resident of Spain and owned, operated, managed and controlled the steamship "Norte."

4. The "Norte" is a vessel of Spanish registry, 321'1" in length, 39'4" in beam and 25'7" in depth. It was built in 1893. In 1943-44 a tweendeck was constructed in the No. 1 hold. Steel tanks constituted the floor of the No. 1 hold.

5. On November 16, 1944, at Barcelona Spain, La Productora de Borax y Articulos Quimicos S. A. delivered to the steamship "Norte" and claimant-respondent 250 casks of tartaric acid powder to be transported to Philadelphia.

6. The tartaric acid powder was packed in wooden barrels or casks about 3 feet high and 1½ to 2 feet in circumference at the widest point. Each cask had a double paper lining. Each cask contained 224 pounds of tartaric acid powder.

7. The casks of tartaric acid powder were in apparent good order and condition when received aboard the "Norte". No notations or exceptions were made on the bill of lading.

8. The casks of tartaric acid powder were stowed at the extreme forward end in lower No. 1 hold, athwartships, in two rows, two tiers high. The casks in the bottom tier were upright, some resting on dunnage over the floor, or tank top, of the hold; those in the second tier were laid on their sides over dunnage. Tartaric acid powder is dry cargo.

9. Above the casks of tartaric acid powder were cases of cigarette paper, bags of briar wood and bags of almonds, in that order upwards.

10. Aft of the casks of tartaric acid powder were 1012 barrels of olives in brine going across the hold and from the aft bulkhead forward to about midway under the hatch, and rising eight or nine tiers high. Under the bottom tier, there was sawdust about one inch thick and each barrel in that tier rested on chocks at the quarters. Between each tier there was

a double layer of dunnage and each barrel in the upper tiers also rested on chocks at the quarters over the dunnage. Olives in brine are wet cargo.

11. Between the casks of tartaric acid powder and the barrels of olives there was a wall of baled cork, about 30 inches in thickness, running athwartship.

12. After loading the tartaric acid powder at Barcelona, the "Norte" proceeded to Tarragona, Alicante, Malaga, Centa, Cadiz, Seville and then to Cadiz again. The "Norte" departed Cadiz for Philadelphia on December 22, 1944; she arrived at Overfalls Light on January 14, 1945, took on a pilot and moved to Richmond on the Delaware River, where she was anchored until January 29, 1945, when she was berthed at Philadelphia.

13. On December 31, 1944, the sea reached force 8 on the Beaufort scale; on January 1, 1945, the wind force was 8 and 9, and the sea 7 and 8. On the latter day the steering gear broke down necessitating use of the hand steering gear for about five hours. On January 2, 1945, the wind and sea force was 6; on January 6, 1945, wind force 6 and 7, sea force 5 and 6; on January 9, 1945, wind force was 8 and sea force 7, both decreasing to 3. On January 11, 1945, the steering chain broke again and was out of operation for two and one-half hours; wind and sea force was 5. The weather and the breaking of the steering chain caused the ship to roll and pitch heavily.

14. The "Norte" had two ventilators with 10 inch shafts at the forward port and starboard corners of hold No. 1, and one ventilator aft which did not service the lower hold and was kept closed because of the deck cargo. During the voyage from Cadiz to Philadelphia, only one of the forward ventilators was fitted with a cowl which was kept trimmed *into* the wind; the other forward ventilator, being a stump, was intended to act as an air exhaust for the hold. The ventilators were closed during bad-weather. The prevailing winds were westerly and southwesterly, blowing from bow to stern.

15. The forward draft of the "Norte" was 19.6 feet; aft, it was 21 feet. The bilge tanks in No. 1 hold, located along the sides and covered with new limber boards permitting water to run into the bilges from the hold, were connected with the bilge tanks in the No. 2 hold. Water in the bilges was measured twice daily; in No. 1 hold it reached 4 inches and in No. 2 hold, 12 inches during bad weather. Excess water was pumped off.

16. On discharge at Philadelphia, 124 casks of the tartaric acid powder, all from the bottom tier, were found to have been stained. The stains, grey and light green in color, appeared on the ends of the casks, rising up the sides for 2 to 6 inches. The paper lining was stiff and stained and the acid caked in the areas of the stains. The metal hoops at the lower ends of the casks showed rust. 126 casks of tartaric acid powder were discharged in good condition and accepted by the libellant.

17. A joint survey of No. 1 lower hold was held on February 15, 1945. The limber boards, the dunnage then in the hold, and the tank tops were wet with salt water, as were the stained casks of tartaric acid. The salt water came principally from leaking barrels of olives. There was also evidence of pronounced sweat.

18. Wiley and Company, a firm of analytical chemists, was engaged, upon joint agreement of the libellant's and the claimant-respondent's surveyors, and twelve samples of the caked tartaric acid powder from the stained casks were submitted for chemical analysis. Duplicate samples were retained for analysis by the libellant and for the claimant-respondent.

19. The reports of Wiley and Company disclosed that of the twelve samples, sulphates were faintly positive in all; chlorides were faintly positive in nine and clearly positive in three. Sulphates and chlorides were clearly positive as to the stained paper lining in each instance.

The libellant's chemist found excessive moisture, sulphates and chlorides, which were sufficient to warrant rejecting the acid for failure to meet the specifications prescribed in the Pharmacopoeia of the United States, 11th revision.

The claimant-respondent's analyst found sulphates and chlorides, but not to such an

884

extent as to constitute a variation from the standards of the Pharmacopoeia of the United States, 11th and 12th revisions.

20. By joint agreement, the claimant-respondent's surveyor arranged with a New York firm to take the 124 stained casks and to separate the caked from the uncaked acid powder.

21. 20,342 pounds of uncaked acid powder were packed in 91 new casks; 6,797 pounds of caked acid powder were packed in 30 new casks; 637 pounds were lost in the process of separation. Nothing was done to remove any impurities.

22. Claimant-respondent's surveyor took samples of both portions of the tartaric acid powder. The report of the analysis of the sample from the uncaked acid powder was sent to the libellant. Libellant accepted the 91 casks.

23. Claimant-respondent's analyst found that the samples from the 91 casks and from the 30 casks met the official Pharmacopoeia standards and that they were the same as the samples which were duplicates of those submitted to Wiley and Company.

24. By agreement, claimant-respondent's surveyor arranged for the sale of the 30 casks of caked acid powder at the rate of 63 cents per pound, duty paid, or a total of $4,282.11. This acid was not "prime goods" because of its caked condition. A sample of tartaric acid powder was tested at the request of the purchaser by an independent chemist and found to satisfy the specifications of the Pharmacopoeia of the United States, 12th revision.

25. The tartaric acid powder herein involved was purchased by the libellant as meeting the standards of the Pharmacopoeia of the United States, 11th revision, and would have accepted such of the shipment as met the specifications therein stated. The 12th revision of the Pharmacopoeia

became official in November, 1942, but any difference between the two revisions is not pertinent here.

26. The market value of tartaric acid powder of the kind and quality herein involved, in good condition, at the date of delivery, was 83 cents per pound, duty paid.

27. The libellant incurred separation expenses in the amount of $1,784.08, and surveyors' expenses, etc., in the amount of $334.87.

### Discussion.

Three grounds are asserted by the libellant as a basis for the liability of the claimant-respondent: (1) Improper and faulty stowage, (2) inadequate ventilation, and (3) deviation. Denying these, the claimant-respondent counters with the assertion that there was no damage for which recovery may be had, or alternately, that the damage was not as great as claimed by the libellant.

Taking up first the question of recoverable damages, if any, it should be noted at the outset that 124 of the 250 casks of tartaric acid powder (hereinafter referred to as powder) were stained and that the powder in the area of the stains was caked. Further, the libellant's witness Millard, testified that the powder was purchased as meeting the specifications of the Pharmacopoeia of the United States, 11th revision,[1] and that despite the caking, it would have been accepted and used if the powder otherwise met U.S.P. standards. The issue, then, is whether the powder complied with the U.S.P. requirements.

Pursuant to agreement, twelve samples were taken from the stained casks; these samples were divided into three portions, one portion being retained by the libellant for analysis, one by the claimant-respondent's surveyor, Gunn, for analysis, and the third being given to Wiley and Company,

[1] The title "Pharmacopoeia of the United States" will be given its usual abbreviation (U.S.P.) throughout, the revision being designated by Roman numerals. U. S.P. XII became effective in November, 1942, but U.S.P. XI was apparently used because it was official in Spain at the time. For the purpose of this case, it is unimportant which is used. It may also be stated that neither revision was introduced into evidence. However, the official Pharmacopoeia is an accepted standard and is so recognized in the Federal Food, Drug, and Cosmetic Act, 52 Stat. 1040 et seq., 1049, June 25, 1938, 21 U.S.C.A. §§ 301 et seq., 351. Consequently, the Court takes judicial notice thereof.

an independent firm of chemical analysts. The results of the tests from Gunn's laboratory and those from Wiley and Company were sent to the libellant. After further discussion, on agreement, Gunn arranged with a New York firm to separate the uncaked and the caked powder in the stained casks. There resulted 91 casks of uncaked powder and 30 casks of caked powder. Gunn took samples of both, sending to the libellant a report on the uncaked powder, which the libellant, after its own tests, accepted. Gunn and Carman, the libellant's surveyor, discussed the disposition of the caked powder, and on agreement, Gunn arranged for and effectuated a sale of the 30 casks to one Wagner.

According to the libellant's analyst, tests of the caked powder made by her revealed the presence of excess moisture, sulphates and chlorides, which made the powder unsuitable under U.S.P. specifications. The report of Wiley and Company on the twelve samples disclosed sulphates faintly positive in all, chlorides faintly positive in nine and chlorides clearly positive in three samples. The claimant-respondent's analyst also found sulphates and chlorides, but testified that they were not present in such sufficient quantities as to disqualify the powder. Further, he testified that on his analysis the lot sold to Wagner also met U.S.P. requirements, that the sample from that lot was identical chemically to the samples which duplicated the Wiley and Company samples, and that, insofar as U.S.P. was concerned, there was no difference between the lot accepted by the libellant and the lot sold to Wagner.

Wagner testified, by deposition, that the powder he purchased was not "prime goods" because of its caked condition. However, a sample taken before the purchase was submitted by him to an independent analyst, Lauro, who reported that it met U.S.P. specifications, although Lauro also admitted that sulphates may have been present; he found no salt.

The testimony of Gunn clearly establishes that the powder in the stained casks was not reprocessed; it was simply separated according to whether it was caked and thus divided was repacked in new casks. No attempt was made to remove any alleged impurities, and there is no evidence that mere separation in itself would have affected the chemistry of the caked material, except perhaps with respect to moisture content.[2] It follows, therefore, that the separation process affords no aid to the claimant-respondent.

The monograph on tartaric acid powder in the U.S.P. provides a test for purity which specifically refers to sulphate. No mention is made therein of chlorides. However, in the General Notices of the U.S.P. the following is found (U.S.P. XI, p. 2; U.S.P. XII, p. 5):

"Unofficial Methods for Determining Added Foreign Substances—

"Inasmuch as the primary object of the Pharmacopoeia is to assure the user of official medicinal substances of their quality and as it is manifestly impossible to include in each monograph a test for every impurity or adulterant that might be present, therefore it is to be understood that the presence of any added foreign substance, which could not have resulted from the use of the ingredients in an official formula, constitutes a variation from the official standard and proof of such variation may be based upon the application of recognized scientific methods whether such methods appear in the Pharmacopoeia or not."

The claimant-respondent does not deny that traces of sulphates or chlorides may have been present, but it asserts that these impurities were not present to the extent that the powder varied from the U.S.P. standard. That is the point of departure for the parties.

The test for sulphate prescribed by the U.S.P. and the test for chlorides as stated in the U.S.P.[3] in their nature leave room

---

[2] Millard testified that in the course of reprocessing some of the impurities would come out, but she did not know the nature of the operation performed here.

[3] Tartaric acid satisfied U.S.P. purity standards if "no turbidity" is yielded upon application of barium chloride, T.S. Chlorides are present when a white curdy precipitate forms with silver nitrate, T.S.

for interpretation; hence, also for reasonable disagreement in borderline instances. Thus, claimant-respondent's analyst conceded the presence of sulphates and chlorides, but in such minor quantities that the U.S.P. standard was nevertheless fulfilled. The libellant's analyst reached the opposite conclusion.

There are available, however, the results obtained by two independent, disinterested analysts, Wiley and Company and Lauro. But these, too, are contradictory. Nevertheless, the evidence warrants the full recognition and credit by the Court of the Wiley and Company reports. Wiley and Company tested twelve samples. Those samples were carefully selected under the supervision of the surveyors for both parties while the powder was in its original containers. They were a fair representation of the caked material. On the other hand, there is no such evidence as to the fairness of the representation of the sample tested by Lauro. Indeed, it was not clearly established that the sample was taken from the caked powder, for Wagner stated that the sample was sent to him, while Gunn stated that it was taken by Wagner "or his principals". Moreover, that sample was taken after the separation process, and is open to the criticism, in absence of contrary evidence, that it may have included uncaked powder as well in such quantities as to affect the outcome of the analysis.

Accordingly, the Court concludes that the caked powder contained sulphates and chlorides, and accepting Millard's testimony, that they were present in sufficient degree to constitute a variation from the U.S.P. standards. The libellant was therefore justified in rejecting the caked material.

The issue next to be determined is the responsibility of the claimant-respondent for the damage. The evidence, it is conceded, establishes the receipt of the casks of powder on board the "Norte" in apparent good order and condition, and the discharge of 124 of them in a damaged state. The damage was caused by contact with the salt water or brine which came from the barrels of olives. The brine was the principal contaminating factor insofar as the contents of the casks are concerned.

On the evidence, claimant-respondent's liability is admittedly governed by Section 4(2) (q) of the Carriage of Goods by Sea Act, 49 Stat. 1210, April 16, 1936, 46 U.S. C.A. § 1304(2) (q).[4] The burden of exoneration according to the terms of the statute rests upon the claimant-respondent. Navarro v. The Ciano, D.C.E.D.Pa., 1946 69 F.Supp. 35. Whether the damage was caused or contributed to by the fault or neglect of the carrier, its agents or servants, is the subject of the present inquiry.

Claimant-respondent's surveyor, Bryant, testified that the barrels of olives were stowed properly in "bilge and cantline" fashion. But the detailed description of the stowage as given by the chief mate refutes that conclusion. The "bilge and cantline", sometimes referred to as "bung up and bilge free", method of stowing barrels has as its basic principle that the "bilge" of a barrel, its widest and weakest part should never bear the weight of the barrel itself or the tier above. Properly, the barrels in the first or bottom tier should rest bung up on dunnage placed at the quarters; the barrels in the second tier are laid in the "cantlines" of the lower tier, that is, the "dip" made by four barrels in the lower tier.[5] The result is that each barrel rests on its quarters, "bilge free," and each in the upper tiers rest on the quarters of the four barrels beneath it.

In the instant case, dunnage was placed between each tier of barrels; each barrel rested on chocks under its quarters on the

---

[4] Section 1304, 46 U.S.C.A. provides:
"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from * * *
"(q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to

show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants or the carrier contributed to the loss or damage."

[5] Modern Ship Stowage (U.S.Govt., 1942) pp. 123–126; Ford. Handling and Stowage of Cargo (2nd Ed. 1944) pp. 80–85.

"floor" thus made. It is obvious that this method effectively destroyed the advantage and overlooked the fundamental principle of "bilge and cantline" stowage: the floor of dunnage necessarily rested on the bilges of the barrels beneath it; the barrels in the lower tiers thus supported the entire weight of the dunnage and the upper barrels on their bilges, exactly where there should have been as little pressure as possible.[6] this was unmistakably bad stowage.[7]

The method of stowing the olives is of particular importance in view of the weather conditions the "Norte" encountered on its transatlantic voyage. The weather may have been severe, but it was expectable during the winter season and did not amount to a "peril of the sea." The Vizcaya, D.C.E.D.Pa., 1946, 63 F. Supp. 898. Proper stowage requires recognition of weather conditions which may be anticipated. Giving to claimant respondent the benefit of the assumption that a reasonable amount of leakage from the barrels of olives may be expected even under the best stowage as a result of the working of the ship during rough weather, nevertheless, the manner of stowage here employed rendered the barrels subject to inordinate pressure at their weakest point. Undoubtedly excessive leakage resulted, and this is attributable to fault. Indeed, the record discloses that water in the bilges increased markedly during storms and this was attributed to the leakage from the barrels of olives.

Moreover, no solace for the claimant-respondent derives from the twice broken steering gear. There is no evidence as to the nature of the inspection made at the commencement of the voyage. Since the weather did not amount to a "peril of the sea" on either occasion when the breakage occurred, it can only be concluded that fault existed here also. And if, as may be reasonably assumed, the breaking of the steering gear rendered the vessel more amenable to the elements, with increased working of the cargo and concomitant enhancement of leakage, the claimant-respondent is responsible. The Vizcaya, supra.

Fault is also manifest in the stowage of the casks of powder. Again granting the assumption of reasonable leakage from the barrels of olives, particularly in view of the weather, dunnage was necessary and desirable in sufficient quantities to raise the powder from the floor of the hold to allow the water in the hold to run clear of the cargo into the bilges. Crediting the chief mate, for the benefits of the claimant-respondent, and assuming that there was some dunnage under some of the casks of powder in the bottom tier, the evidence fails as to sufficiency. Sawdust is inadequate as was testified because it absorbs and holds moisture in addition to threatening the freedom of the rose-boxes. In any event, no attempt was made, most likely because of impossibility, to separate those casks resting on dunnage from those admittedly short of that protection. The Vallescura, 1934, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373. Of course, it is well-settled, that dunnaging is the responsibility of the carrier. Section 3(2), Carriage of Goods by Sea Act, 49 Stat. 1208, April 16, 1936, 46 U.S.C.A. § 1303(2).

---

6 In Modern Ship Stowage, pp. 125, 126, it is stated: "There is a considerable difference of opinion as to the advisability of 'skidding' or 'flooring off' a barrel cargo after several tiers have been laid. By 'flooring off' or 'skidding' is meant the laying of a platform or floor over a complete tier of barrels. Some authorities hold that the laying of such a floor results in pressure on the bilges of the barrels in the tier immediately beneath it, whereas if there is no flooring, each barrel will rest, as pointed out above, on four barrels beneath it." In the instant case the carrier went further, flooring off each tier.

7 Mention must be made of the lack of evidence to show that the barrels of olives were in fact stowed "bung up," as they should have been. See discussion in Ford, Handling and Stowage of Cargo, pp. 80–84; see Gulden v. Hijos de Jose Taya, D.C.E.D.N.Y., 1917, 243 F. 780, affirmed 2 Cir., 1918, 252 F. 577. The point is not decisive, but it accentuates one of the ways leakage could have occurred with fault, contributing to the damage. The burden of establishing lack of negligence is, as noted above, on the claimant-respondent.

All of the casks of powder in the bottom tier were stained, the stains varying from two to six inches up the sides of the casks. The damage was caused by the failure of sufficient dunnage under the casks of powder and by excessive leakage from the barrels of olives as a result of their faulty stowage. The evidence of fault, as so far developed, forces the Court to place responsibility upon the claimant-respondent. It is hardly necessary to rely on those cases holding that negligence as an inference of fact is established when dry cargo is damaged by liquid goods. See The Schickshinny, D.C.S.D.Ga., 45 F.Supp. 813.

In addition, it may be noted that the "Norte" lacked proper and sufficient ventilation in the No. 1 hold. There were three 10 inch ventilators, two forward and one aft. The aft ventilator was not in use because of the deck cargo. Of the two forward ventilators, only one was fitted with a cowl, which was kept trimmed *into* the wind. The prevailing winds were westerly and southwesterly, blowing from bow to stern. The other ventilator was a mere stump, intended to act as an air exhaust for the hold. The evidence is that the ventilation was insufficient. Also, it was improperly managed. Generally, the lee ventilators should be trimmed into the wind and the weather ventilators against the wind, since the natural flow of warm air in an enclosed compartment is opposite to the direction of the wind. Ford, Handling and Stowage of Cargo (2nd ed. 1944) 218. Captain Parry, the libellant's surveyor, testified to phenomenal sweat in the hold as a result of this condition. Evidence of sweat was admitted by the chief mate. Naturally, the sweat contributed to the amount of water in the hold and bilges[8] combining with the brine from the olives.

■ Accordingly, in the opinion of the Court, the evidence affirmatively reveals fault on the part of the carrier, its agents or servants, which actually caused and/or contributed to the damaging of the powder. Claimant-respondent must be held liable therefor. Carriage of Goods by Sea Act, supra; The Vallescura, supra; Navarro v. The Ciano, supra. Consequently, it is not necessary to discuss the contention of the libellant relating to deviation.

Only a word need be said with respect to damages. Expenses incurred by the libellant, for its surveyors, tests, etc., amounted to $334.87. Expenses of separation amounted to $1,784.08. These are not contested. The market value of prime tartaric acid powder, admittedly, was 83 cents per pound, duty paid. 7,434 pounds, which if in prime condition would have been worth $6,170.22, were damaged and lost. 6,797 pounds[9] of damaged powder were sold at 63 cents per pound, or at a total of $4,282.11. The libellant is entitled to recover its loss of $1,888.11, in addition to the expenses above, or a total of $4,007.06.

In accordance herewith, I state the following

### Conclusions of Law.

1. This Court has jurisdiction over the subject matter and the parties herein.

2. The claimant-respondent, its agents or servants, was guilty of fault or neglect in the handling, stowing, carrying, keeping and caring for the cargo here involved, which fault or neglect actually caused, or contributed to, the damage to that cargo.

---

[8] The record discloses that water in the bilges reached 4" in hold No. 1 and 12" in hold No. 2. There was no separation between the bilges of the two holds. Accordingly, the water in the bilges of No. 1 hold was probably increased by leakage from barrels of olives in No. 2 hold, as testified by the Captain, as well as by sweat and leakage from No. 1 hold. The difference in the quantity of water in the connected bilges is accounted for by the claimant-respondent in the suggestion that the vessel was down 18" by the stern. However, the libellant notes that hold No. 1 was approximately 51' in length as against the overall length for the ship of about 321', so the pitch in the No. 1 hold was not more than about 2.9". In any event, it is possible that the water in the bilges of No. 1 hold, increased from so many sources, was splashed out on the floor particularly during storms when the vessel was pitching and rolling heavily.

[9] 637 pounds were lost in the process of separation.

3. The libellant is entitled to recover in this action against the claimant-respondent its loss and damage in the amount of $4,007.06.

An order may be entered pursuant hereto.