**EASTERN GAS & FUEL ASSOCIATES v. MARTIN MARINE TRANSP. CO. et al.**

**THE SOUTHERN SWORD.**

**THE P. F. MARTIN.**

No. 10428.

United States Court of Appeals Third Circuit.

Argued May 10, 1951.

Decided July 20, 1951.

James B. Doak, Philadelphia, Pa. (Conlen, LaBrum & Beechwood, Philadelphia, Pa., on the brief), for appellant.

Harrison G. Kildare, Philadelphia, Pa. (Rawle & Henderson, Thomas F. Mount, Joseph W. Henderson, Philadelphia, Pa., on the brief), for appellee.

Before MARIS, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

Responsibility for the sinking of a barge and the loss of its cargo of coal is the contested issue in this libel in personam and in rem instituted by the shipper against the carrier and its tug which was towing the barge. Libellant says that the unseaworthiness of the barge and the negligence of the respondents caused the mishap. Respondents deny this and say that the sinking of the barge was caused by such peril of the sea as constituted an excepted risk under the charter party. After full hearing, the district court made findings sustaining the carrier's position and entered a decree dismissing the libel as to both respondents. This appeal followed.

So much of the evidence as relates to observed occurrences is not seriously conflicting. Difficulty arises in drawing inferences from the known facts and in the application of legal concepts.

The contract of affreightment was a "voyage charter", subject to the provisions of the Harter Act,[1] for the coastwise shipment of coal from Norfolk, Virginia to Newtown Creek, New York. It contained the familiar exemptions from liability for "acts of God, dangers and accidents of the sea". The role of the respondent corporation was that of a private carrier. The carrying vessel, originally a Great Lakes cargo steamer, had been converted into a coastwise coal barge. She was 250 feet long with a 46 foot beam. Lacking means of self propulsion, she was dependent upon towing.

On the morning of March 18, 1946, during the course of the northward voyage,

[1]. 27 Stat. 445, Act Feb. 13, 1893, 46 U. S.C.A. § 192. Our disposition of this appeal makes it unnecessary to discuss the impact of the Harter Act in so far as it might relieve the carrier from liability for faults in navigation or management of the vessel.

396

there occurred a notable increase in the force of the wind and consequent waves from the northeast. At the same time, there were swells from the southeast. The result was a cross or "tumbled" sea. By early afternoon tug and tow, although continuing on course, were "diving" and twisting in the tumbled sea and their progress had been greatly slowed. During the afternoon, wind velocity increased to thirty knots, a "moderate gale" of force 7 on the Beaufort Scale.

At 2:30 p. m., the master of the tug changed course toward the Delaware Breakwater with a view to making the nearest harbor. At about 3 p. m., the barge began to list to starboard. The list increased gradually throughout the afternoon. This condition was not observed from the tug, which was separated from the barge by the length of a 1200 foot towing hawser, until 5:30 when the barge indicated distress by raising a flag upside down. Immediately the tug cut the hawser, put about, and in a skillful maneuver removed the crew from the barge. The list, estimated to have been about thirty degrees at that time, continued to increase and shortly thereafter the barge turned bottom up, floated a short time in that position, and at 6:40 p. m. sank.

There was no direct evidence of the cause of the list or how weather conditions contributed to it. There was no evidence that the barge had sprung a leak. There was evidence that the center hold of the barge was filled to only 82% of its capacity although in the middle it was filled up to the hatch cover. In substance, the upper part of the pile of coal was pictured as an inverted cone with unfilled space between it and the sides of the ship. Upon this hypothesis, witnesses for libellant expressed the opinion that as wind and wave pounded the starboard side of the barge, the inertia of the loose coal caused it to shift to starboard with a resultant listing of the vessel.

In these circumstances, the district court expressly found that "The sinking of the barge and the resulting loss of the cargo were due to an exceptional storm which constituted a peril of the sea." The record does not support this finding.

A moderate gale of thirty knots is not extraordinarily severe March weather along the middle Atlantic coast. Neither is a cross sea such as this record discloses an unfamiliar or catastrophic phenomenon. Respondent makes much of the action of the master of the tug in making for harbor as an indication of the severity of the weather. However, the master himself, in describing the situation, stressed the effect of wind and sea in slowing progress rather than as constituting a hazard to tug or tow. Indeed, in his testimony, the master admitted that the weather "wasn't unusual" but was "the sort of weather you would encounter off the coast in March of the year". Beyond that, he conceded the correctness of a statement introduced as originally made by him the day after the sinking that " * * * at 5:00 o'clock I [the master] never dreamt of danger, going right along nice about our business, and then when we were going down to supper we noticed the flag go up and then noticed he was listing * * *." Conditions thus described and revealed fall far short of that severity which constitutes such a peril of the sea as excuses the failure of a vessel to weather a storm. The prevailing and, in our judgment, correct judicial view was expressed in The Manuel Arnus, D.C.S.D.N.Y.1935, 10 F.Supp. 729, 732: " * * * the weather must be irresistible, overwhelming, and extraordinary for the particular time of year to be a good exception * * *."

In The Plow City, 3 Cir., 1941, 122 F.2d 816, 818, this court observed with reference to a mishap experienced by a coastwise steamer in the South Atlantic off Savannah that "If a shipowner warrants his vessel to be 'tight, stanch, strong, and in every way fitted for the contemplated voyage,' his vessel must be so equipped as to withstand the buffeting of a forty mile gale".

No case has been brought to our attention in which Atlantic weather no more severe than that experienced here has been recognized as an excepted peril of the sea. To the contrary, in this circuit and

in the Second Circuit, Atlantic gales of substantially greater severity than that here involved have repeatedly been held not to constitute such a peril. The Plow City, 3 Cir., 1941, supra; Edmond Weil, Inc., v. American West African Line, Inc., 2 Cir., 1945, 147 F.2d 363; The Norte, D.C.E.D. Pa.1947, 69 F.Supp. 881; The Vizcaya, D. C.E.D.Pa.1945, 63 F.Supp. 898. We conclude, therefore, that the affirmative finding that the barge capsized because of a storm which constituted a peril of the sea was erroneous.

 The district court also drew the following conclusion: "The contract between the parties was a contract of private carriage and the presumption of unseaworthiness arising from an unexplained sinking is inapplicable. The burden of showing unseaworthiness or fault is upon the libellant, and this burden it has not met." The court was mistaken in ruling that the presumption of unseaworthiness arising from an unexplained sinking is inapplicable to private carriage by sea. It is true that in such circumstances the burden of showing unseaworthiness is upon the complaining shipper. Commercial Molasses Corp. v. New York Tank Barge Corp., 1941, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89. But the logical inference of unseaworthiness which follows from the unexplained sinking of a vessel in weather she should be able to withstand suffices to discharge that burden unless and until the carrier shall affirmatively show exculpatory circumstances. S. C. Loveland Co. v. Bethlehem Steel Co., 3 Cir., 1929, 33 F.2d 655; Metropolitan Coal Co. v. Howard, 2 Cir., 1946, 155 F.2d 780. In the Commercial Molasses case, supra, this rule was recognized but the carrier had made a showing sufficient to offset the presumption. No such showing has been made in this case. Indeed, the only attempted explanation of what actually happened is that offered by libellant to the effect that the stowage of coal was such that the cargo shifted as the barge was buffeted. Such evidence, if believed, would certainly establish libellant's case. However, we deem it unnecessary to consider the effect of this evidence in strengthening the inference of un-

seaworthiness. It is sufficient that libellant was entitled to prevail on the basis of the inference of unseaworthiness which should have been drawn from the unexplained sinking in weather the vessel should have been able to withstand.

 It remains only to consider the claim asserted against the tug in rem. The evidence amply supports the finding of the district court that the tug was not at fault. Even before any danger to the barge became obvious, the tug captain was doing all' he could to get the cargo to a harbor. Therefore, the decree dismissing the libel in rem was proper.

It follows that as between the libellant and the respondent Martin Marine Transportation Company, the decree of the district court must be reversed and the cause remanded with directions to ascertain the damages sustained by the libellant and to enter final judgment for libellant for that sum. As between libellant and respondent Steam Tug P. F. Martin, the decree of the district court will be affirmed.