**ESTABLISSEMENTS EDOUARD MATERNE, S. A., Libelant,**

v.

**THE S.S. LEERDAM, her engines, etc. and Holland-America Line, Respondent.**

United States District Court
S. D. New York.
July 19, 1956.

368

Bigham, Englar, Jones & Houston, New York City, for libelant, F. Herbert Prem, New York City, of counsel.

Burlingham, Hupper & Kennedy, for respondent, Hervey C. Allen, Jr., Norman M. Barron, New York City, of counsel.

DAWSON, District Judge.

This is an action in admiralty for cargo damage sustained by a shipment of cartons of tinplate shipped on board respondent's vessel "Leerdam" on a voyage from Philadelphia to Antwerp in October, 1951. The damage consisted of staining which was caused by oil and turpentine which leaked from drums stowed in the same compartment of the vessel as the tinplate.

It was admitted that the tinplate was received by the ship in apparent good order and condition, and that 641 cartons of the tinplate were stowed by respondent in the after part of the No. 3 shelter deck in which there were also stowed 105 drums of a turpentine substitute and 75 drums of oil. It was also admitted that upon discharge of the cargo at Antwerp, the 641 cartons of tinplate had been in contact with the turpentine substitute and/or oil which had leaked from their containers and that such leakage had caused damage to the cartons of tinplate.

The issue is whether damage to the cargo was caused without the actual "fault or neglect" of the agents or servants of the carrier within the meaning of 46 U.S.C.A. § 1304(2) (q), and also whether the damage was caused by the "Perils, dangers, and accidents of the sea" within the meaning of 46 U.S.C.A. § 1304(2) (c).

The following facts appear without substantial dispute:

The 641 cartons of tinplate were stowed in three tiers in the after end of the port side of the No. 3 upper 'tween deck. The bottom tier of cartons rested on two layers of dunnage, each layer being one inch in thickness.

There were stowed on top of the cartons of tinplate eight layers of melamine powder contained in heavy paper bags. The two commodities were separated by a solid layer of dunnage and canvas.

The cartons of tinplate and the bags of melamine powder were secured against movement fore and aft, or athwartship, by dunnage and wood.

In the same compartment of the ship, the drums of oil and turpentine were stowed in the forward part in two tiers of 55-gallon drums. The bottom tier of drums was laid on two layers of dunnage, each layer being one inch in thickness, and there was also one layer of dunnage of one inch thickness laid between the two tiers of drums.

The drums were secured by stretching a one inch steel wire across each tier of drums. This wire was attached to a ring secured to the ship's rib and extended across the row of drums to a similar ring attached to the center line

trunkway. Each wire was tightened with a turnbuckle. No dunnage was placed upright between the drums; no dunnage was placed between the wire lashing and the row of drums, and there was no tomming to protect against vertical movement of the drums while at sea.

The testimony of the second officer of the ship was that the voyage across the ocean encountered rough weather with high seas, resulting in pitching and rolling of the ship. The ship's log indicated that the wind reached a velocity of 8 on the Beaufort Scale, which would indicate a wind of about 39 to 46 miles per hour.

The testimony of the second officer was that one oil drum and one drum of turpentine leaked during the voyage. The leaking liquids flowed to the after end of the 'tween deck and lodged between and underneath the two layers of dunnage upon which libelant's cartons of tinplate rested. He stated that under normal circumstances, the liquid would have gone down the drain pipe, which was located in the after part of the 'tween deck. However, the bags of melamine powder had broken and the powder had sifted to the deck from the torn bags and the scupper pipe became clogged with a paste formed by the admixture of the oil and turpentine and the melamine powder, thereby blocking the drain pipe. Thus, the accumulated liquid rose above the two inch dunnage level and came in contact with the tinplate. Some of the cartons of tinplate were entirely saturated with the liquid and fell apart when handled.

■ It is well established that a carrier of goods by sea is prima facie liable for damage to cargo received in good condition but which is outturned in a damaged condition at the end of the voyage, unless the carrier can affirmatively show that the immediate cause of the damage is an excepted cause for which the law does not hold him responsible. Schroeder Bros., Inc., v. The Saturnia, 2 Cir., 1955, 226 F.2d 147.

■■ The mere fact that rough seas were encountered did not constitute an excepted cause which in this case would excuse the vessel from the requirement of delivering the cargo in good condition. Here the evidence is not such as to show that the damage to the cargo resulted from a "peril of the sea". There was no evidence that the weather was so severe that any damage was done to the ship, or that it was worse than reasonably might have been anticipated on such a voyage at this period of the year. See The Rosalia, 2 Cir., 1920, 264 F. 285, 288; Philippine Sugar Centrals Agency v. Kokusai Kisen, 2 Cir., 1939, 106 F.2d 32, 34, 35. Unquestionably, rough weather and heavy seas were encountered, but where a vessel is subjected to no greater risk or damage than reasonably might have been anticipated on the voyage, "peril of the sea" furnishes no immunity. The Schickshinny, D.C.S.D.Ga.1942, 45 F.Supp. 813, 817.

Thus, it has been held in this District that even if there were heavy seas and a wind force of 9 and 10 on the Beaufort Scale, damage to cargo would not be due to perils of the sea, for weather of such type should have been anticipated in the stowage of cargo. Middle East Agency v. The John B. Waterman, D.C.S.D.N.Y. 1949, 86 F.Supp. 487.

■ Respondent contends that whether or not the leakage was due to the perils of the sea, nevertheless, the leakage was not due to its negligence. The evidence was conflicting as to whether the leakage was caused by any act or omission of the respondent in stowing the cargo. However, a carrier is required to stow the cargo so that if leakage does occur, other cargo will be spared damage. The Charlton Hall, D.C.S.D.N.Y.1922, 285 F. 640; The H. G. Johnson, D.C.S.D.N.Y.1891, 48 F. 696; cf. General Foods Corp. v. The Troubador, D.C.S.D.N.Y.1951, 98 F. Supp. 207, 211.

■ The possibility of leakage of wet cargo must be anticipated and the cargo, if properly stowed, must be so stowed

that when leakage occurs, damage will not occur to other cargo.[1]

Where oil is stowed near dry cargo and thereafter leaks and damages the dry cargo, this fact, in and of itself, creates an inference of bad stowage.

The C Lopez y Lopez, 2 Cir., 1924, 297 F. 457:

"The oil got on the cork; therefore the oil must have been within leaking distance. Consequently it was stowed comparatively near the cork. But this is bad stowage; i. e., negligence." 297 F. at page 458.

The Norte, D.C.E.D.Pa.1947, 69 F. Supp. 881:

"It is hardly necessary to rely on those cases holding that negligence as an inference of fact is established when dry cargo is damaged by liquid goods." 69 F.Supp. at page 888.

See also: The Charlton Hall, D.C.S.D. N.Y.1922, 285 F. 640, 642; The Maggie M., D.C.S.D.N.Y.1887, 30 F. 692, 693.

Two expert witnesses called by libelant testified that in their opinion the stowage was improper. One witness called by respondent testified that in his opinion the stowage was proper. However, the witness called by the respondent, a Captain Anderson, did not seem to have qualifications which entitled his opinion on this subject to great weight. In this respect, I reach the same conclusion as Judge Walsh did with respect to this same witness. See Hecht, Levis & Kahn v. S.S. Pres. Buchanan, D.C.S.D.N.Y. 1955, 1956 A.M.C. 354.

I do not believe that the respondent has overcome the inference of negligence which exists by reason of the fact that the cargo received by them in good condition was outturned in a damaged condition at the end of the voyage.

Respondent also urges that libelant is bound by the findings of Captain Stubbe, a marine surveyor at the Port of Antwerp, who was appointed by common agreement between the parties and who rendered a report. It appears that two surveyors were appointed by the parties, one surveyor Deronghe "to determine the nature and amount of the damage" and the other surveyor Stubbe "to determine the causes of the damage". Counsel for respondent conceded that this was not an arbitration. From that standpoint, therefore, any finding of this surveyor was not legally binding upon the parties. However, respondent contends that since Captain Stubbe was authorized by libelant, as well as respondent, to determine the "cause" of the damage, libelant is bound by his findings as to the cause.

The report of Captain Stubbe was received in evidence. It made the following findings:

"The damage in question resulting from the smearing by chemical liquids was caused indirectly by the bad weather, with which the ship had to struggle during the sea voyage, which directly resulted in the

---

1. Bridger & Watt's "Practical Cargo Stowage", contains the following statement (p. 135):

"Oil is a source of danger to other cargo, either from itself or from its odour, and hence must not be stowed amongst other goods which may be damaged by either of these sources, as no matter how well the barrels of oil may be stowed, there is always a risk of leakage, or breakage.

"Oil should not be stowed in tween or upper decks in a general cargo, but by itself in a portion of the lower holds. If for any reason it is necessary to stow barrels in the tween decks, great care must be taken to see that the scuppers are clear to allow any leakage to run direct into the bilges."

"Modern Ship Stowage" (U. S. Department of Commerce, 1942):

"Barrels of lubricating oil are frequently carried as part of a general cargo and, in such case, should be given ordinary barrel stowage for liquids. Special care should be taken in the choice of the cargo space for stowage, however, with reference to the other commodities contained in the general cargo. Oil is a source of danger to other cargo, either from leakage or from its odor, and consequently should not be stowed among other goods which might be damaged by either of these causes." (p. 294).

concurrence of two facts or stowage disturbances. First of all, the leaking of the drums of chemical liquids, the contents of which ordinarily would have discharged into the bilges through the drain pipe without having resulted in any damage; secondly, the tearing of the paper bags of melamine, a small quantity of which came onto the strainer of the said drainpipe and completely clogged it. Due to the concurrence of these two unavoidable facts, these liquids could not flow away and they were continuously thrown by the laboring of the ship against the paper packages of tin plates in question and furthermore absorbed by the dunnage and paper of these goods. The wood and paper, being of a very hygrometric nature, these liquids were able to work upward more and more during the course of the voyage."

With these findings, the Court agrees.

Captain Stubbe then added to his report the following:

"Accordingly, we agree with the opinion of the loading experts who ascribe the damage in question to sea damage for which the Master cannot be held responsible."

In making this finding, the surveyor was attempting to pass upon a legal question. When he was directed by the parties to ascertain the cause of the damage, his authority did not extend beyond determining the actual physical causation of the damage. Respondent would have the Court interpret the word "cause" as including the question of "legal liability". This was beyond both the authority and the power of this surveyor. The question as to whether damage of this nature was occasioned by the "perils of the sea" involved a lot of factors which obviously were not considered by Captain Stubbe and also involved the question of what that phrase means from a legal standpoint, on which he was not qualified to pass. The Court, therefore, concludes that so far as Captain Stubbe purported to render an opinion that the damage was "sea damage for which the Master cannot be held responsible", he expressed an opinion beyond his authority and beyond his capacities.

The Court concludes that libelant is entitled to a decree for the cargo damage sustained by it on the shipment in question. There remains only the amount of damages and, by consent, this question is not now before the Court. If the parties are unable to agree, further evidence may be submitted on that issue only. Meanwhile, no final decree will be entered.

Findings of fact and conclusions of law consistent with this opinion may be submitted by proctors for libelant either now or on final decree.