**The NEW ROTTERDAM INSURANCE CO., Ltd. and Allgood Auto Sales Inc., Libellants,**

v.

**S.S. LOPPERSUM, her engines, boilers, etc., N.V. Stoomvaart-Maatschappij "Oostzee" and Independent Gulf Line, Respondents.**

United States District Court
S. D. New York.
Feb. 18, 1963.

Hill, Rivkins, Middleton, Louis & Warburton, New York City, for libellants, Alan S. Loesberg, Martin B. Mulroy, New York City, of counsel.

Dougherty, Ryan, Mahoney & Pellegrino, New York City, Robert J. Giuffra, New York City, of counsel.

DAWSON, District Judge.

This is an action for cargo damage. The cargo, which is the subject of the action, consisted of a shipment of thirty-two unboxed Volkswagens shipped from Hamburg, Germany, to Houston, Texas, in March 1960. Libellants seek to recover for damages to the automobiles while they were in the possession of the respondents. It was stipulated that the damages to be awarded (exclusive of interest, costs and disbursements) should not exceed the sum of $5,187.20. There was no dispute that the Volkswagens were damaged while in the possession, custody and control of the respondents. The respondents took the position that any damage sustained by the cargo was due to causes for which the respondents are exonerated by Section 1304 of Title 46 of the United States Code,[1]

---

1. "§ 1304. Rights and immunities of carrier and ship—Unseaworthiness

\* \* \* \* \*

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

\* \* \* \* \*

commonly known as the Carriage of Goods by Sea Act, *i. e.*, that the damages alleged were the result of an act of God or a peril of the sea.

The Court makes the following findings of fact:

1. The shipment of thirty-two unboxed Volkswagens was received by the respondents in apparent good order and condition at Hamburg on March 12, 1960, and respondents issued a clean bill of lading testifying to the apparent good order and condition of the automobiles.

2. The automobiles were unloaded and subsequently reloaded at Antwerp between March 14th and 18th, 1960. At that time the ship took on a cargo of steel tubes, pipes and plates over which the automobiles were placed. Twenty-three of the automobiles were stowed in No. 5 lower hold over dunnage that had been placed on top of the steel products. These are the automobiles which are the primary concern of this action.

3. The owner and consignee of the shipment of automobiles was Allgood Auto Sales, Inc. The libellant, New Rotterdam Insurance Co., Ltd., sues as a subrogee of certain rights of Allgood.

4. The vessel departed from Antwerp on March 18, 1960. Subsequently the vessel called at Hamilton, Bermuda, on March 29, 1960, and arrived at Houston, Texas, on April 4, 1960. The automobiles were discharged on or about April 7, 1960. A number of the automobiles were discharged in a damaged condition.

5. The ship was built in 1957 and is approximately 490 feet long, with a maximum breadth of approximately 62 feet, a gross tonnage of 6,795 tons, and a deadweight tonnage of 10,505 tons. There was a total of 216 automobiles carried on the vessel on this voyage.

6. According to the logbook of the ship, libellants' automobiles were found damaged during the voyage on the morning of March 26th. On March 25, 1960 the wind encountered by the ship prior to 8:00 P.M. ranged between force 3 and force 6 on the Beaufort scale;[2] from 8:00 P.M. to midnight the wind increased to force 7, according to reports submitted by the ship to the United States Weather Bureau. However, the log entry on the ship showed that on the watch between 8:00 P.M. and midnight on March 25th the wind had a force of 6–9. This log entry must be considerably discredited because it is obvious from an examination of it and from the testimony of a handwriting expert that the original log entry for that watch had been erased and a new log entry put in. The Court therefore accepts the report of the ship made to the Weather Bureau, rather than the revised and altered entry in the log. The ship made no effort to explain why the log entry had been corrected, or when it was corrected, or, in fact, if it was corrected after this litigation had been brought.

7. The Court finds that the weather experienced during the voyage was the usual weather to be expected during a March crossing in the Atlantic Ocean, and that the wind forces and the waves encountered were not so unnatural that they could be deemed to be an act of God or a peril of the sea. The master testified by deposition. He testified that it was quite generally expected that the ship would encounter fairly severe weather in the winter months; that on March 23rd they passed through a severe storm and on March 25th passed through another storm. He said that this storm started during the last watch on March 25th and continued for a

"(c) Perils, dangers, and accidents of the sea or other navigable waters;
"(d) Act of God."

2.

| Beaumont number | Miles per hour |
|---|---|
| 3 | 8–12 |
| 4 | 13–18 |
| 5 | 19–24 |
| 6 | 25–31 |
| 7 | 32–38 |
| 8 | 39–46 |
| 9 | 47–54 |

couple of hours into the first watch of March 26th. The captain testified that on March 25th they had a full storm and that the ship rolled normally until "one heavy roll," which threw him off his feet on the bridge. He stated that he had not seen the wave which caused the roll but that it came from athwartships, although the entries in the log would indicate that the ship was having a following wind. These were the entries in the log for that day which were erased and changed. On the following day the officers made an inspection of the cargo holds and found that a certain number of the Volkswagens had been damaged. The captain admitted that the steel cargo under the Volkswagens had shifted. Photographs introduced in evidence of the condition in the hold at the time of discharge of the cargo showed that dunnage between the steel cargo and the automobiles had become disarranged and that the cars were thrown about.

8. The cause of the damage, with respect to the automobiles stowed in the lower No. 5 hold was the improper stowage of the automobiles. The evidence which is accepted as correct by the Court was that proper stowage practice would not have stowed those automobiles over steel pipes and tubes which are subject to shifting, and did shift during the voyage. The respondents also failed to use chocks, i. e., pieces of wood to secure the automobiles, or wooden shoring to prevent rolling of the automobiles. The automobiles were secured by the use of a Hercules rope, which was a rope of small diameter, intertwined with steel wires. The testimony was that several of the cars were lashed together by these ropes and then the ropes were lashed to the side of the hold. The rope had, according to an expert witness, a tensile strength of 1,240 pounds. Lashing several Volkswagens together created a weight of some 6000 or 7000 pounds upon these ropes. The testimony of an expert witness was that such stowage was improper and was the proximate cause of damage to the cars when the ship rolled in the heavy sea.

## Discussion

There was no doubt in this case that the Volkswagens were taken on the ship in good order and condition and that they were turned out in a damaged condition at Houston. Only two questions were presented. One question was whether the automobiles were properly stowed on the ship. The other was whether the damage to the ship's cargo was occasioned by the "perils, dangers, and accidents of the sea or other navigable waters" or "act of God" within the meaning of those terms in Section 1304 of Title 46 United States Code. The evidence was clear and uncontroverted as to the method of stowage. The evidence of the expert for the libellants as to the improper stowage was uncontroverted by the respondents. Furthermore it became obvious, as a matter of common sense, that the manner of stowage was not sufficient to protect the vehicles in the event the ship should roll in heavy weather.

The respondents maintain that the damage to the cargo was not caused by negligence but resulted solely from a single large wave that made the ship roll violently to starboard. The respondents further contend that the unusual size of the wave requires that it be classified as a peril of the sea exempting the carrier from liability.

The Court of Appeals in R. T. Jones Lumber Co. v. Roen Steamship Co., 270 F.2d 456, 458 (2d Cir., 1959), defined the term, "perils of the seas":

" 'Perils of the seas are understood to mean those perils which are peculiar to the sea, and which are of an extra ordinary nature or arise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence.' The Giulia, 2 Cir., 218 F. 744, 746."

The above definition does not absolve the carrier from all damage caused by high winds and rough seas. As Lord Her-

schell said in The Xantho, 12 A.C. 503, at p. 509 (House of Lords, 1887):

"I think it clear that the term 'perils of the sea' does not cover every accident or casualty which may happen to the subject matter of the insurance on the sea * * * They do not protect, for example, against that natural and inevitable action of the winds and waves, which results in what may be described as wear and tear."

■ The test, in essence, is one of foreseeability. Was the weather encountered unusual and beyond reasonable expectation? R. T. Jones Lumber Co. v. Roen Steamship Co., supra; Government of Pakistan, Ministry of Food and Agriculture v. The S. S. Ionian Trader, 173 F.Supp. 29 (S.D.N.Y.1959), aff'd Meredith v. The Ionian Trader, 279 F.2d 471 (2d Cir., 1960); Establissements Edouard Materne, S. A. v. The S. S. Leerdam, 143 F.Supp. 367 (S.D.N.Y. 1956).

■ In the instant case it was uncontroverted that although the ship ran through storms crossing the Atlantic, such storms were not unusual for that time of year in those waters. It must be expected that a freighter crossing the Atlantic will run into heavy seas and rolling seas in the month of March. The Schickshinny, 45 F.Supp. 813, (S.D. Ga.1942) (windforce of 10 held foreseeable). The extent of the wind force may be in dispute, but it was not of such magnitude as to constitute an act of God, or peril of the sea, within the meaning of the Carriage of Goods by Sea Act. Furthermore, the extent of the storm is somewhat in doubt due to the fact that the ship changed the entry in the log with reference thereto and gave a

different report on the wind force to the United States Weather Bureau than appeared in its log. The credibility of the master of the ship, and of the ship's log, is cast much in doubt by these facts.[3] Nevertheless, if the automobiles had been properly lashed to the ship; if they had been supported by chocks; and if they had not been placed upon other cargo which would have a tendency to shift in a high sea, there can be little doubt that they could have come through the seas in the North Atlantic without damage. The carrier took a calculated risk in securing the cargo as it did. Having lost that calculated risk it is responsible for the damage that the libellants have sustained. Beck & Co. v. S. S. Steel Voyager, 1957 A.M.C. 1515, 1519.

*Conclusions of Law*

1. The shipment was transported subject to the provisions of the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq.

2. Respondents did not sustain their burden of establishing that the damage to or loss of the automobiles resulted from an excepted cause under the provisions of Section 1304 of Title 46 United States Code.

3. Respondents did not sustain their burden of proving that the cargo of automobiles was loaded, stowed, carried and discharged properly.

■ 4. The weather encountered by the ship was not of such catastrophic nature or so overwhelming as to constitute an act of God or peril of the sea.

Judgment shall be entered for the libellants. The determination of the amount of damages, within the limitation hereinabove set forth, shall be made by a Commissioner. Submit proposed

---

3. Courts have universally condemned the practice of altering any of the entries in the ship's log. Judge Learned Hand in Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, 102 F.2d 450, 453 (2d Cir., 1939), said: "* * * [W]e cannot avoid the conclusion that it [the log book] had been dressed up to excuse the ship's faults. That goes much further than merely to discredit the document itself; it is positive evidence upon the very issue, and weighty evidence as well. Wigmore § 278. When a party is once found to be fabricating, or suppressing, documents, the natural, indeed the inevitable, conclusion is that he has something to conceal, and is conscious of guilt. * * *" Skibs Aktieselskapet Orenor v. S. S. Audrey, D.C., 181 F.Supp. 697, 1960 A.M.C. 723.

decree providing for the appointment of a Commissioner.

This opinion shall constitute the findings of fact and conclusions of law of the Court.